IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| **ANTHONY ALVAREZ,** ) | |
| ) | |
|     **Plaintiff,** ) | |
| ) | |
| v. ) | No. 2:25-cv-02281-KHV-TJJ |
| ) | |
| **EMILY CHELLGREN** in her individual ) | |
| capacity and **SARAH WATERS** in her ) | |
| individual capacity, ) | |
| ) | |
|     **Defendants.** ) | |

**DEFENDANT EMILY CHELLGREN'S MEMORANDUM IN SUPPORT OF HER
MOTION TO DISMISS**

## INTRODUCTION

Plaintiff Anthony Alvarez is a current KU student who was previously employed as a proctor at KU's Grace Pearson Scholarship Hall. As proctor at Grace Pearson, Plaintiff's duties were similar to those of a resident assistant in a traditional dormitory, including enforcement of relevant building-use policies, such as those governing bathroom facilities.

Grace Pearson is a co-ed scholarship hall that includes both male and female residents. As an older building, Grace Pearson has communal bathrooms, rather than single-user bathrooms that are more common in modern residence halls. While KU does have certain residential housing options designated as gender-neutral,[1] in early 2025, KU determined that the legally applicable building code required Grace Pearson's *communal* bathrooms to be designated by sex, and it directed that any gender-neutral use of Grace Pearson's communal bathrooms be discontinued.

Plaintiff objected to the change in policy, and he told his supervisors at KU that he would refuse to implement it as proctor. He also undertook various actions to undermine the policy, including criticizing the policy in an interview with the news organization KCUR, which then published that criticism, specifically identifying Plaintiff as a proctor. Although Plaintiff later wrote an op-ed[2] in the University Daily Kansan stating that his refusal to enforce housing policy was an infraction that contributed to his eventual termination as proctor, he claims in this lawsuit that he was terminated principally because he violated a KU policy that allegedly requires housing employees to refer all media inquiries to a supervisor instead of responding.

Plaintiff brings this lawsuit against two KU employees in their individual capacities only.

---

[1] These are largely suite-style arrangements, with single-user bathrooms and showers.

[2] *How Getting Fired for Protesting Made Me Think About Power*, University Daily Kansan, https://tinyurl.com/y76xzbyf ("I decided not to enforce any policy affecting gender-neutral hosing at [Grace Pearsons]. I said as much to supervisors and later to the media . . . .").

As relevant to this brief, Plaintiff asserts First Amendment and procedural due process claims under 42 U.S.C. § 1983 against former Assistant Director of KU Housing and Residence Life Emily Chellgren. But as an individual being sued for damages in her individual capacity, Ms. Chellgren enjoys qualified immunity. Given that Plaintiff fails to plead any constitutional violation, let alone a clearly established one, Plaintiff's claims against Ms. Chellgren should be dismissed under Rule 12(b)(6) for failure to state a claim and/or based on qualified immunity.

## STATEMENT OF FACTS[3]

During the 2024-2025 academic year, Plaintiff was employed as a proctor at KU's Grace Pearson Scholarship Hall. Doc. 17 ("FAC") ¶ 6. The duties of a proctor at a scholarship hall are similar to those of a resident assistant in a traditional dormitory. *Id.*

In the Spring semester of 2025, KU announced a policy change whereby KU would eliminate Grace Pearson's "gender-neutral bathroom" and "gender-inclusive room assignments" and "require students to use the bathroom that aligns with their gender listed" in KU's records. *Id.* ¶¶ 9-11. In February 2025, Plaintiff was interviewed by the KCUR news service about the policy change, and Plaintiff's statements were subsequently published by KCUR in an article that identified Plaintiff as a proctor. *Id.* ¶¶ 7, 10-13. Relevant excerpts of that article include:

> Alvarez worked as a proctor, which he said is similar to a resident assistant, at GP. He said he applied to serve as a proctor in GP again for the 2025-26 school year, but he was assigned to a different residence hall. He said he asked his bosses about the new assignment.
>
> "They told me that they weren't confident that I would implement the policies that they were going to change at GP," he said. "At a more personal meeting I had with someone higher in housing, they told me it's because they were worried I was going to be frustrated and because they were changing the policies."
>
> …

---

[3] For purposes of this motion, Ms. Chellgren relies on the facts as alleged by Plaintiff. Ms. Chellgren reserves the right to contest any or all of Plaintiff's allegations, should the case proceed beyond the motion to dismiss stage (it should not).

2

> Alvarez said he's turning down the offer to work at another residence hall, and he's moving out of student housing. But he said several other students are staying to try to preserve the community they've built.
>
> "Currently, the plan is for people to stay . . . as we continue to fight. Because this is definitely a political decision," Alvarez said, referencing several anti-trans executive orders and attacks on diversity, equity and inclusion by the Trump administration.
>
> "But those laws are incredibly fluid. There could be court cases; we could pass something to Congress," he said. "So a lot of people are staying, just in case we're able to overturn something or the fight within KU is able to go our way."

*KU Students Protest Housing Changes They Say Will Harm Trans and Nonbinary Residents*, KCUR, https://tinyurl.com/3926nf5m.[4]

Plaintiff claims that, thereafter, he suffered various corrective actions with respect to his employment, culminating in his termination, and that such corrective actions were predicated, at least in part, on Plaintiff's violation of a KU policy (referred to herein as the "Media-Referral Policy") that allegedly required residence-life employees to direct all media inquiries to their supervisor, rather than responding directly. FAC ¶¶ 15-25. Legally, Plaintiff claims the Media-Referral Policy is an unconstitutional prior restraint on speech that restricted his ability to speak as a private citizen on matters of public concern. *Id.* ¶¶ 33-41. He also claims that the corrective actions were retaliation for the content of his speech as a private citizen on a matter of public concern. *Id.* ¶¶ 42-55. Finally, Plaintiff claims that he was not given full and complete notice of his right to appeal corrective actions or an opportunity to be meaningfully heard prior to termination, resulting in a violation of his due process rights. *Id.* ¶¶ 56-61.

Plaintiff originally filed these claims against KU and Defendants Chellgren and Sarah Waters in their official capacities, seeking prospective relief, damages, and attorneys' fees. *See*

---

[4] Because the FAC refers to the KCUR article and relies on it, the Court can consider the full content of the article in resolving Defendants' motion. *See, e.g.*, *Woods v. Ross*, 2021 WL 3077236, at *16 (D. Kan. 2021), *aff'd* 2023 WL 1794170 (10th Cir. 2023).

3

Doc. 1.  He sought, and was granted leave, to amend these claims in response to Defendants' first motion to dismiss.  *See* Docs. 10-17.  The amended complaint dropped all claims against KU, changed the official-capacity claims to individual-capacity claims, and dropped all requests for prospective relief.  *See, e.g.*, Doc. 13-1.  Plaintiff now seeks only to recover damages and fees.

## SPECIFIC RELIEF SOUGHT AND NATURE OF THE MATTER

Defendant Chellgren brings this motion to dismiss the FAC under Rule 12(b)(6) because Plaintiff fails to state any claim against Ms. Chellgren, warranting dismissal.  Ms. Chellgren is also entitled to qualified immunity, likewise warranting dismissal under Rule 12(b)(6).

## STANDARD OF REVIEW

***Failure to State a Claim.***  "[T]o withstand a Rule 12(b)(6) motion to dismiss, a complaint must contain enough allegations of fact, taken as true, to state a claim to relief that is plausible on its face." *Khalik v. United Air Lines*, 671 F.3d 1188, 1190 (10th Cir. 2012) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim is facially plausible when the allegations give rise to a reasonable inference that the defendant is liable." *Mayfield v. Bethards*, 826 F.3d 1252, 1255 (10th Cir. 2016).  While extensive, detailed factual allegations are not required, survival of a 12(b)(6) motion to dismiss "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause action will not do." *Twombly*, 550 U.S. at 555.

In a § 1983 action, it is "particularly important" for a complaint to "make clear exactly *who* is alleged to have done *what* to *whom*, to provide each individual with fair notice as to the basis of the claims against him or her, as distinguished from collective allegations against the state." *Brown v. Montoya*, 662 F.3d 1152, 1163 (10th Cir. 2011). "When various officials have taken different actions with respect to a plaintiff, the plaintiff's facile, passive-voice showing that [her] rights 'were violated' will not suffice." *Pahls v. Thomas*, 718 F.3d 1210, 1225-26 (10th Cir. 2013).

4

"Likewise insufficient is plaintiff's more active-voice yet undifferentiated contention that 'defendants' infringed his rights.'" *Id.* at 1226.

***Qualified Immunity.*** Qualified immunity generally shields "government officials performing discretionary functions" from liability for damages where the conduct "does not violate clearly established statutory or constitutional rights." *See Tonkovich v. Kansas Bd. of Regents*, 159 F.3d 504, 516 (10th Cir. 1998). When a qualified immunity defense is raised, this Court "must decide (1) whether the plaintiff plausibly alleged a violation of a constitutional right, and (2) if so, whether that right was clearly established at the time of the alleged violation." *Frey v. Town of Jackson, Wyo.*, 41 F.4th 1223, 1232 (10th Cir. 2022). Courts "may address either prong first," *id.*, and the "[p]laintiff bears the burden to show the law was clearly established," *id.* at 1235.

"Clearly established" means the law (at the time of challenged conduct) was "sufficiently clear that every reasonable official would understand that what he is doing is unlawful"; it must be "beyond debate." *District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018). This "can come from a Supreme Court or Tenth Circuit decision on point, or from the clearly established weight of authority from other courts." *Frey*, 41 F.4th at 1235. The Supreme Court has "repeatedly told courts . . . not to define clearly established law at a high level of generality." *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018). The Plaintiff "must articulate the clearly established constitutional right and the defendant's conduct which violated the right with specificity." *Id.*

## ARGUMENT

Plaintiff asserts three constitutional claims under 42 U.S.C. § 1983 against Ms. Chellgren in her individual capacity, predicated on the First Amendment and the Due Process Clause.

### I.  COUNT I FAILS TO STATE A CLAIM

Count I appears to be a relic of the original complaint against the University and individuals in their *official* capacities. Indeed, the vast majority of allegations in Count I are facial challenges

5

to the Media-Referral Policy, and facial challenges are simply not cognizable against individual defendants in their individual capacities. Further, any "as applied" challenge is simply duplicative of Count II (retaliation), and the claims are thus appropriate addressed under that framework.

Beginning with Count I's facial challenges, Plaintiff claims that Ms. Chellgren "maintained and enforced a policy and practice that requires Residence Life student employees to refer media (press) inquiries to a supervisor in a manner which *appears* to entirely restrict their ability to speak to the media." FAC ¶ 34 (emphasis added). Plaintiff claims this policy is "overbroad on its face" (*id.* ¶ 36), is "impermissibly vague" (*id.* ¶ 37), "imposes content-based and viewpoint-based restrictions" (*id.* ¶ 35), and "functions as a prior restraint on speech" (*id.*). Those types of claims are not actionable against individual defendants in their individual capacities, because "when professors or students challenge a university's policies, the proper defendant party is the university or university board." *Buchanan v. Alexander*, 919 F.3d 847, 854-55 (5th Cir. 2019) (collecting cases). In *Buchanan*, for example, the plaintiff sued various university administrators on a facial First Amendment challenge to the school's sexual harassment policy. *Id.* at 855. The Fifth Circuit rejected that effort, because the plaintiff "sued only employees and officials with individual and limited roles in administration of LSU's polices, but with no ultimate authority to enforce them." *Id.* The university itself is the only proper defendant for a facial challenge. *Id.*

This makes sense, because "[a] facial challenge usually invites prospective relief, such as a declaration or injunction, whereas an as-applied challenge invites narrower, retrospective relief, such as damages." *Schmidt v. Falcon School Dist.*, 2025 WL 887428 (D. Colo. 2025). And with respect to the legal claim here, "Section 1983 plaintiffs may sue individual-capacity defendants only for money damages and official-capacity defendants only for injunctive relief." *Brown*, 662 F.3d at 1161 n.5. Simply put, there is no cognizable claim for a facial constitutional challenge

6

against individual University administrators in their *individual* capacity.[5]

To the extent Plaintiff attempts to sustain Count I based on conclusory allegations of an "as applied" challenge, that's duplicative of Count II. Indeed, Plaintiff's allegation in this respect is that he was terminated "pursuant to this policy" (*id.* ¶ 38). That's the same allegation made in the retaliation claim in Count II. And no matter how Plaintiff characterizes it, when a public employee claims adverse action as the result of an alleged First Amendment violation, the proper construct is a First Amendment retaliation claim, with all of the applicable public-employee doctrines discussed in Section II, *infra*. *See Gilmore v. Beveridge*, 2023 WL 4104579, at *7 (D. Kan. 2023); *see also MacRae v. Mattos*, 106 F.4th 122, 132-35 (1st Cir. 2024).

Finally, in the event this Court determines that any of Count I is independently cognizable (it is not), Ms. Chellgren is entitled to qualified immunity. Ms. Chellgren is not aware of any case, much less one binding on this Court, holding that a media-referral policy like the one here is unconstitutional in any respect. Thus, any alleged constitutional violation is not clearly established, entitling Ms. Chellgren to dismissal based on qualified immunity.

## II.  PLAINTIFF'S ALLEGATIONS OF FIRST AMENDMENT RETALIATION AGAINST DEFENDANT CHELLGREN FAIL TO STATE A CLAIM

### A.  Plaintiff's Retaliation Claim Fails As A Matter Of Law Because His Alleged Speech Was Made Pursuant To His Official Duties

"To establish a claim for First Amendment retaliation, a plaintiff must identify constitutionally protected speech and show that defendants retaliated against him for exercising that speech right." *Klaassen v. Atkinson*, 348 F. Supp. 3d 1106, 1166 (D. Kan. 2018). Ultimately, plaintiff must establish the five elements of the "*Garcetti/Pickering* analysis": "(1) the employee's

---

[5] Even if there were such a cause of action, Plaintiff—no longer an employee nor subject to this policy—lacks standing, as the prospective injunctive relief central to any facial challenge would have no impact on him. *See, e.g.*, *Savage v. Gee*, 665 F.3d 732, 740-41 (6th Cir. 2012).

speech was not made pursuant to an employee's official duties; (2) the employee's speech was on a matter of public concern; (3) the plaintiff's free speech interests outweigh the government's interests, as employer, in promoting the efficiency of the public service; (4) the protected speech was a motivating factor in the adverse employment action; and (5) the defendant would not have reached the same employment decision in the absence of the protected conduct." *See Knopf v. Williams*, 884 F.3d 939, 945 (10th Cir. 2018); *see also Brammer-Hoelter v. Twin Peaks Charter Academy*, 492 F.3d 1192, 1202-03 (10th Cir. 2007) (citing *Garcetti v. Ceballos*, 547 U.S. 410 (2006) and *Pickering v. Bd. of Educ.*, 391 U.S. 563 (1968)). The first three are issues of law for the Court. *See Knopf*, 884 F.3d at 945. Here, Plaintiff fails the first element because the comments he made to KCUR were made pursuant to his official duties as a proctor as a matter of law.

The Tenth Circuit takes a broad view speech is made pursuant to one's duties. *See, e.g.*, *id.* There are no "bright line rules"; many factors may be relevant to the Court's case-by-case analysis, *see id.*, including the "content of the speech," the "employee's chosen audience," *see Klaassen*, 348 F. Supp. 3d at 1167, the employee's job description, and the employee's usual tasks, *see Knopf*, 884 F.3d at 945. In fact, "speech may be made pursuant to an employee's official duties even if it deals with activities that the employee is not expressly required to perform." *Brammer-Hoelter*, 492 F.3d at 1203. If an employee "engages in speech during the course of performing an official duty and the speech reasonably contributes to or facilitates the employee's performance of the official duty, the speech is made pursuant to the employee's official duties." *See id.*

For example, in *Brammer-Hoelter*, the Tenth Circuit concluded that "nearly all" of the discussions a group of elementary school teachers had at gatherings—off-campus and attended by parents and members of the public—were pursuant to official duties. *Id.* at 1204. The speech included discussion of school policies (that the teachers were charged with enforcing) and even

8

included comments about how money was spent within the school. *Id.* Likewise, in *Klaassen*, this Court dismissed a former tenured professor's First Amendment retaliation claim based on complaints he aired to *The Lawrence Journal-World* about governance issues within the KU Medical Center and how certain officials were spending funds. 348 F. Supp. 3d at 1170-71. Even though this Court could not conclude that Dr. Klaasen's official job duties included speaking to the media, and none of the articles "attribute[d] any particular words to him," this Court concluded that "Dr. Klaasen's speech was related to alleged wrongdoing directly impacting his ability to carry out his official duties" and, thus, was made pursuant to his official duties. *See id.* at 1170.

Here, Plaintiff's job duties included "[d]emonstrat[ing] a commitment to personal integrity, such as . . . adherence to laws and policies" and "[e]ncouraging responsible behavior by . . . enforcing University of Kansas and KU Housing & Residence Life regulations and policies." Ex. A (March 14 Letter) at 1. Those policies included the new bathroom policy for Grace Pearson. As such, Plaintiff spoke to KCUR about a policy he was "expected" and "paid to" adhere to and enforce in his duties as a Proctor. *See Brammer-Hoelter*, 492 F.3d at 1204. Like the plaintiffs in both *Brammer-Hoelter* and *Klaassen*, Plaintiff criticized a policy that would have a direct impact on how he performed his job duties.

Furthermore, even if Plaintiff's job duties did not specifically include speaking to the media, he explicitly spoke to KCUR in his role as a KU-employed proctor. *See, e.g.*, KCUR Article ("Alvarez worked as a proctor, which he said is similar to a resident assistant, at GP.")[6];

---

[6] Contrary to his allegations in ¶¶ 45-46 of the FAC, Plaintiff's employment role was integral to the KCUR Article. Of the thirteen paragraphs directly relating to Plaintiff, the fourth identifies and describes his role as proctor. *See* KCUR Article, "Student reactions." Those thirteen paragraphs discuss not only Alvarez's opinions about the policy and the Grace Pearson community, but also meetings with his superiors regarding his position in the 2025-26 school year and his decision to turn down their offer to continue working in student housing. *See id.*

9

Ex. B (March 13 Letter) ("You indicated in the meeting that you talked with the reporter from KCUR about your position as an undergraduate staff member working in [GP] despite knowing that your job expectations prohibited you from doing so."). Moreover, he indicated his unwillingness to enforce the policy. *See, e.g.*, KCUR Article ("Alvarez said he's turning down the offer to work at another residence hall, and he's moving out of student housing. . . Currently the plan is for [other] people to stay . . . as *we* continue to fight."). Plaintiff cannot invoke First Amendment protection where he spoke as a KU employee about a policy he was required to enforce in his role, including his unwillingness to enforce that Policy. *See, e.g.*, *Brammer-Hoelter*, 492 F.3d at 1203. Plaintiff was not merely a student engaging in protected speech; he was a University employee speaking about his unwillingness to implement a policy he was responsible for implementing.

### B. Plaintiff Fails to Allege a Violation of Clearly Established Law by Defendant Chellgren

Independent from Plaintiff's failure to state a claim, Ms. Chellgren is entitled to qualified immunity. Because Plaintiff does not state a claim for First Amendment retaliation, he also fails the first prong of the qualified immunity inquiry. *Frey*, 41 F.4th at 1232. He also fails the second, because no clearly established law holds that Ms. Chellgren's alleged actions are unconstitutional.

To avoid dismissal, Plaintiff needs to identify a factually analogous and binding case (or an overwhelming weight of authority) showing that Plaintiff was *not* acting pursuant to official duties. Here, that would require cases holding that a proctor (or a very factually similar employee) discussing his unwillingness to enforce a housing policy that his job requires him to enforce is *not* pursuant to official duties. Ms. Chellgren is aware of no such case.

Additionally, even though it is **Plaintiff's burden** to show the alleged violation is clearly established, cases like *Brammer-Hoelter* (Tenth Circuit) and *Klaasen* (District of Kansas applying

10

binding precedent to a case about comments to media) illustrate that Ms. Chellgren *did not* violate a clearly established right by placing Plaintiff on probation for speaking with the media about his role and duties as a KU proctor, including his unwillingness to enforce certain policies, all in violation of the Media-Referral policy.  This is especially true for purposes of the *Garcetti/Pickering* analysis because "it involves a balancing of interests."  *See, e.g.*, *Klaasen*, 348 F. Supp. 33 at 1179-80; *see also Knopf*, 884 F.3d at 946-51 (illustrating the high degree of factual specificity required to overcome qualified immunity in a *Garcetti/Pickering* analysis).  Although Plaintiff was not terminated "based on" his comments to KCUR, *see* FAC ¶ 27, the same cases show that no clearly established right would have been violated under those circumstances either.

### III. PLAINTIFF'S PROCEDURAL DUE PROCESS ALLEGATIONS AGAINST DEFENDANT CHELLGREN FAIL TO STATE A CLAIM

#### A. Plaintiff Fails to Allege a Procedural Due Process Claim against Defendant Chellgren

To analyze a procedural due process claim, courts engage in a two-step inquiry: first, the court must determine whether the plaintiff has a constitutionally protected property interest, and second, the court must determine whether the plaintiff was "afforded the appropriate level of process."  *See, e.g.*, *Barrow v. Kansas State Univ.*, 2023 WL 10101935 (citing *M.A.K. Invest. Grp., LLC v. City of Glendale*, 897 F.3d 1303, 1308 (10th Cir. 2018)).  Plaintiff's claims fail both steps.

##### 1. Plaintiff Fails to Allege a Constitutionally-Protected Property Interest

Plaintiff fails at the first step because he has failed to identify a constitutionally protected property interest.  The only "interest" he asserts is a "property interest in continued employment." *See* FAC ¶ 57.  However, the FAC presupposes this property interest exists merely because Plaintiff was a KU employee, without citation to any contract provision making termination for cause.  This is not enough.  Public employment in Kansas is presumptively at-will.  *See Washington v. Unified Government of Wyandotte Cty, Kan.*, 847 F.3d 1192, 1201 (10th Cir. 2017).

11

To overcome the presumption of at-will employment, "a written contract must expressly fix the duration of employment or otherwise limit the employer's ability to discharge the employee." *See Washington*, 847 F.3d at 1201. Without citation to his own employment contract, Plaintiff cannot rebut the presumption of at-will employment under Kansas law and, thus, fails to state a due process claim altogether.

### 2. Plaintiff Was Afforded the Appropriate Level of Process

Even if Plaintiff did have a property interest in continued employment, he received sufficient pre-termination process. Due process requires that "a deprivation of life, liberty or property be preceded by notice and opportunity for a hearing appropriate to the nature of the case." *See Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542 (1985). This generally requires "some kind of hearing prior to the discharge of an employee who has a constitutionally protected property interest in his employment," in which the employee is given "notice and an opportunity to respond." *See id.* at 542, 546. The "hearing" should include "(1) oral or written notice to the employee of the charges against him; (2) an explanation of the employer's evidence; and (3) an opportunity for the employee to present his side of the story." *Merrifield v. Bd. Of Cnty. Comm'rs for Cnty. of Santa Fe*, 654 F.3d 1073 (10th Cir. 2011). But, to be sure, "a full evidentiary hearing is not required," and "[t]he necessary notice may come at the hearing itself." *Id.*; *see also*; *Barrow v. Kansas State Univ.*, 2023 WL 10101935 (10th Cir. 2023) ("the constitution does not guarantee . . . a particular type of pretermination process").

Plaintiff does not dispute that he was provided with both oral and written notice of the charges and evidence against him before being terminated on March 14, nor can he. He met with Complex Director Rebekah Love and Ms. Chellgren on March 7 to discuss the KCUR Interview and KCUR Article, during which Plaintiff acknowledged that he spoke with the reporter "despite knowing that [his] job expectations prohibited [him] from doing so." *See* Ex. B. On March 13,

12

Plaintiff received a letter documenting the March 7 meeting; setting forth the specific provisions of Plaintiff's employment contract that had been violated; documenting Plaintiff's probationary status and related Action Plan, as "discussed and agreed upon by [Plaintiff]" at the March 7 meeting; and clearly stating that additional violations of his terms of employment or the Action Plan could subject him to termination. *See id.*; *see also* FAC ¶ 16. That same day, Ms. Chellgren learned of additional violations and met with Plaintiff to discuss them. *See* Ex. A.[7] During that meeting, the parties discussed Plaintiff's failure to take certain actions set forth in the Action Plan, as well as Plaintiff's participation in hanging a banner on the front side of the Grace Pearson building in further direct violation of University policies. *See id.* On March 14, Plaintiff received a letter documenting the March 13 meeting; again setting forth the specific provisions of Plaintiff's employment contract he violated; and notifying Plaintiff that he was being terminated. *See id.*

Plaintiff does include the bald assertion that Defendants failed to provide him with "an opportunity to be meaningfully heard prior to [his] termination." FAC ¶ 59. However, this conclusory allegation is directly contradicted by the documents referenced in the FAC, and "factual allegations that contradict a properly considered document are not well-pleaded facts that the court must accept as true." *Matney v. Barrick Gold of N. Am.*, 80 F.4th 1136, 1145 (10th Cir. 2023) (cleaned up). During both the March 7 and March 13 meetings, Plaintiff was given an opportunity, and even encouraged, to present his side of the story. *See, e.g.*, Ex. A (Plaintiff admitted to his participation in the March 11-12 incident and, though told that "one of the purposes of th[e] meeting was to give [him] the opportunity to provide [his] point of view," "chose not to

---

[7] Because the FAC refers and relies on both the March 13 and 14 letters, the Court can consider the full content of them in the course of resolving Defendant's motion. *See, e.g.*, *Woods*, 2021 WL 3077236, at *16.

13

elaborate further . . . on the reasons for [his] participation."); Ex. B (Plaintiff was "asked the reasoning behind [his] decision to disregard" staff expectations). This is enough. In fact, it is altogether *more* process than the Tenth Circuit has found to be sufficient.

In *Powell v. Mikulecky*, the Tenth Circuit concluded that a full time fire-fighter's due process rights were not violated when he was terminated at the end of a short, informal meeting with the fire chief, during which the chief asked if the plaintiff had asked fire fighters from other districts not to sign a mutual aid agreement; the plaintiff confirmed; the chief informed the plaintiff he was fired; and the plaintiff then refused to answer any other questions until he spoke with an attorney. *See* 891 F.2d 1454, 1455, 1459 (10th Cir. 1989); *see also Roberts v. Winder*, 16 F.4th 1367 (10th Cir. 2021) (concluding one pre-deprivation meeting and one letter in response to the plaintiff's own written objection to his removal was sufficient, and reiterating that "[a] brief face-to-face meeting with a supervisor provides sufficient notice and opportunity to respond to satisfy the pretermination due process requirements of *Loudermill*"). Here, Plaintiff was given two in-person meetings to learn of and respond to the charges and evidence against him, as well as two letters setting out his violations in detail. This is particularly sufficient in light of the post-termination process that Plaintiff was offered and elected not to pursue.

As an additional—and dispositive—matter, the availability of the Kansas Judicial Review Act (KJRA), Kan. Stat. Ann. §§ 77-601–631, constitutes an adequate post-deprivation remedy. *See, e.g.*, *Barrow*, 2023 WL 10101935, at *6; *see also Gaskill v. Fort Hays State Univ.*, 70 P.3d 693, 695 (Kan. Ct. App. 2003) (holding "[t]he KJRA establishes the exclusive means of judicial review of agency actions," including actions taken by state educational institutions). Plaintiff was also offered the opportunity to appeal his termination decision. *See* Ex. A. Plaintiff summarily claims this appeal right was "vague," FAC ¶ 31, and that the notice of right to appeal was not "full

14

and complete," *id.* ¶ 58. However, Plaintiff failed to appeal his termination, and therefore waived any procedural due process claim challenging those post-deprivation proceedings. *See, e.g.*, *Roberts*, 16 F.4th at 1375 ("[Plaintiff's] failure to participate in post-deprivation proceedings . . . waived his procedural due process claim challenging those post-deprivation proceedings").

As evidenced by multiple pre-termination meetings and letters, Plaintiff's unclaimed opportunity for post-termination appeal, and available remedies under the KJRA, Plaintiff was provided adequate procedural due process and, thus, Count III must fail.

### B. Plaintiff Fails to Allege a Violation of Clearly Established Law by Defendant Chellgren

Alternatively, it is not "sufficiently clear" under controlling precedent that "a reasonable official would understand that terminating [Plaintiff] without a more elaborate hearing than that which he received violated" his due process rights. *See Powell*, 891 F.2d at 1457; *see also, e.g.*, *White*, 137 S. Ct. at 552 (2017) ("the clearly established law must be 'particularized' to the facts of the case."). In fact, as discussed, Tenth Circuit precedent makes clear that Plaintiff was afforded any due process to which he *might* have had a right. *See, e.g.*, *Powell*, 891 F.2d at 1455, 1459.

Plaintiff also fails to specify particular actions by Ms. Chellgren herself that allegedly violated Plaintiff's due process rights. *See, e.g.*, *Pahls*, 718 F.3d at 1225-26 ("[I]t is incumbent upon a plaintiff to 'identify *specific* actions taken by *particular* defendants' in order to make out a viable § 1983 . . . claim."). Count III only refers to failures by the "Defendants," and thus fails to state an individual-capacity claim that can survive qualified immunity. *See* FAC ¶¶ 56-61.

Both prongs of the qualified immunity inquiry confirm that Ms. Chellgren is entitled to qualified immunity on Plaintiff's procedural due process claim.

### CONCLUSION

This Court should grant this motion and dismiss Plaintiff's claims with prejudice.

Respectfully Submitted,

/s/ Michael T. Raupp
DEREK T. TEETER   KS BAR NO. 23242
MICHAEL T. RAUPP   KS BAR NO. 25831
HUSCH BLACKWELL LLP
4801 Main, Suite 1000
Kansas City, Missouri  64112
(816) 983-8000
(816) 983-8080 (FAX)
derek.teeter@huschblackwell.com
michael.raupp@huschblackwell.com

***Attorneys for Defendants***

16

## CERTIFICATE OF SERVICE

I hereby certify that on September 15, 2025, I filed the foregoing document via the Court's ECF system, which will cause a true and correct copy of the same to be served electronically on all ECF-registered counsel of record.

/s/ Michael T. Raupp
*Attorney for Defendants*